DAVID W. SLAUGHTER (USB #2977)
**SNOW, CHRISTENSEN & MARTINEAU**
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
Facsimile No.: (801) 363-0400

KENT RAYGOR (Cal. Bar No. 117224)
PAUL S. MALINGAGIO (Cal. Bar No. 90451)
DAVID GARCIA (Cal. Bar No. 151349)
**SHEPPARD, MULLIN, RICHTER & HAMPTON**
333 South Hope Street
Forty-Eighth Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398

L. SCOTT PRIMAK (Cal. Bar No. 152353)
**THE GATOR CORPORATION**
2000 Bridge Parkway, Suite 100
Redwood City, California 94065
Telephone: (650) 232-0300
Facsimile: (413) 828-3071

Attorneys for Defendant The Gator Corporation



FILED
U.S. DISTRICT COURT
18 AUG 03 PM 4:28
DISTRICT OF UTAH
BY:_____
DEPUTY CLERK

FILED IN CLERK'S OFFICE
U.

C...   ...  03

LUTHER...   ..., Clerk
By:
Deputy Clerk

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

---

| | |
|---|---|
| OVERSTOCK.COM, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE GATOR CORPORATION, a Delaware corporation, and WHENU.COM, INC., a Delaware corporation,<br><br>Defendants. | **MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT THE GATOR CORPORATION TO DISMISS UNDER RULES 12(b)(2) and 12(b)(6) OR, ALTERNATIVELY, TO TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA**<br><br>No. 2:03 CV 00569 TS<br><br>Judge Ted Stewart |



This memorandum supports the motion by Defendant The Gator Corporation ("TGC" or "Defendant") for summary dismissal of this action on two separate grounds:

1.      There is no basis for personal jurisdiction over TGC in this Court. TGC does not engage in continuous and systematic activities in Utah, nor does it target or direct activity to Utah with the intent to conduct business there. The mere fact that TGC's on-line Internet services are accessible to individuals in Utah (as they are throughout the country) is not sufficient to subject TGC (a California-based company) to litigate in this forum, consistent with due process.

2.      Even if jurisdiction were proper, plaintiff ("Plaintiff" or "Overstock") has failed to plead facts supporting a justiciable claim.  Plaintiff contends that TGC's business practice of contracting with computer users to receive valuable software via the Internet in exchange for the receipt of "pop-up" or "pop-under" advertisements is unlawful under trademark laws, copyright laws, and various comparable state statutes and common law theories.  Such activity is clearly beyond the scope of such laws, and Plaintiff's efforts to cram Defendant's activity into alleged violations of those laws fails to make such activity actionable.

Alternatively, and in the event the Court deems summary dismissal on the foregoing grounds to be inappropriate at this time, TGC requests that venue of this action be transferred to the Northern District of California, under 28 U.S.C. § 1404, for the convenience of the parties and the witnesses.[1]

---

[1]This motion comes to the Court in a unique procedural setting and in the context of an anticipated transfer of this case to and consolidation with pending multi-district litigation ("MDL") as a tag-along case pursuant to Rules 1.1 and 7.5(e) of the Judicial Panel on Multi-district Litigation ("JPML"). Several similar cases against TGC have been consolidated for coordinated pre-trial proceedings and discovery under 28 U.S.C.§1407, before the Honorable J. Owen Forrester in the United States District Court for the Northern District of Georgia.

## INTRODUCTION/BACKGROUND

TGC is a small, privately held, emerging company located in Redwood City, California. Declaration of Scott VanDeVelde ('VanDeVelde Dec.") at ¶ 2 (attached as Exhibit A).[2]  Founded in 1998, TGC is a developer and distributor of innovative software products and also offers online advertising services. *Id.* Through its Gator Advertising and Information Network (GAIN"), TGC offers its clients a highly effective means to advertise to consumers whose computers are connected to the Internet by applying contextual marketing concepts that allow TGC to deliver highly relevant advertising directly to the consumer's computer. *Id.* at 3.[3] TGC delivers advertisements only to its subscribers — all of whom have agreed to TGC's privacy statement and license agreement and have been informed that they will receive advertisements from TGC as a condition of obtaining one of many software programs free of charge. Declaration of Mitchell T. Weisman ("Weisman Dec.") at ¶6 (attached as Exhibit B).

TGC has no place of business or tangible assets in Utah, and none of its operations are directed or managed in Utah. Weisman Dec. ¶ 7. The physical location of its advertising clients is generally unimportant to TGC, whose advertising services depend on and are furnished over the Internet and are thus typically furnished for businesses likewise engaged in Internet-based commerce. *See* VanDeVelde Dec. ¶ 6. The actual physical location of any particular TGC advertising client is thus merely fortuitous. *Id.* In fact, since it began actively conducting business in 2000, TGC has furnished advertising services for only a few advertising clients who happened to be located in Utah, and from

---

[2]The VanDeVelde Declaration and the Weisman Declaration (cited below) are submitted in support of the motion to dismiss for lack of personal jurisdiction and to provide the Court with general background information; they are not relied upon in support of TGC's motion to dismiss for failure to state a claim upon which relief can be granted.

[3]This type of advertising is sometimes known as "pop-up" advertising as the ads typically appear in the form of small windows on the consumer's computer screen when the user accesses the Internet.

which it has generated revenue totaling less than 0.7% of its total revenue over the same period. VanDeVelde Dec. ¶ 6. It has had only one Utah-based advertising client during 2003, generating revenue totaling $7,500, or less than 0.02% of TGC's total 2003 revenue to date. *Id.*[4]

There is, of course, the potential that some of TGC's members of TGC's 35-million-member GAIN network may reside in Utah. As argued below, however, online businesses are not properly subject to suit throughout the country merely because their sites and services are made available over the Internet, and TGC's "Internet presence" is the only fact that Overstock can claim in support of its effort to subject TGC to suit in this forum. Its conclusory allegation "on information and belief" that TGC has "constitutionally sufficient contacts with Utah" to justify personal jurisdiction [Complaint at ¶ 11] is not enough. (If, notwithstanding, the Court finds sufficient justification for personal jurisdiction in this matter, TGC has moved in the alternative that this action (or any portion that remains after pending Multi-District Litigation ("MDL") proceedings) be transferred to the United States District Court for the Northern District of California under 28 U.S.C. §1404.)

Even if this Court reaches the merits, however, the advertisements generated by TGC's software are nothing more than a routine use of the Windows computer operating environment[5].

---

[4]Interestingly, plaintiff itself was TGC's largest single advertising client in Utah in 2001, accounting for more than 88% of TGC's revenue from Utah-based clients during that year. However, this lawsuit has nothing to do with that contractual relationship, which has since terminated.

[5]TGC requests that this Court take judicial notice of the basic computer screen display operation provided by the Windows operating system–namely, that Windows is a widely utilized computer operating system published by Microsoft Corporation that uses overlapping screens on a computer display, allowing users to switch between several windows, each of which may contain different information, including programs or advertising, without requiring them to exit and reinitiate each individual window. The operating system allows the display of multiple screens that may appear in front of, or behind, other screens on the computer display. *See The American Heritage College Dictionary 1545* (3d ed. 1997) ("window[s]... 8. *Comp. Sci.* A small area on a screen in which a file or part of a file can be displayed."); Microsoft Corporation, *Introduction to the Windows Family of Operating Systems From Windows 1.0 to Windows NT* (viewed June 28, 2002); www.microsoft.com/windows/WinHistoryDesktop.asp ("Windows 1.0 also allowed users to switch between several programs — without requiring them to quit and restart individual applications. ... Windows 2.0... allowed users to overlap windows, control screen layout, and use

-4-

Plaintiff's claim or suggestion that TGC actually "inserts" other advertising on Overstock's Web site, is a grab at astonishing and unprecedented control over a computer user's ability to select and view material of his or her interest.

As the Court likely has experienced or seen, the Windows operating system (and the similar Apple operating system) allows for the display of different sub-screens or "windows." In this manner, the Windows operating system ultimately places the computer user in control of the existence, size, and placement of any particular window. The pop-up windows generated by TGC's software, like any other windows, can be moved around the screen by subscribers, enabling the subscriber to view any other window that may also be open. VanDeVelde Dec. at ¶ 3. Also like any other window, subscribers may close the window by clicking an "X" in the upper right hand corner, which, again, will reveal any other windows that may be open. *Id.* The "pop up" windows described in Plaintiff's complaint (*e.g.*, at ¶ 41) are no different than the many other windows that periodically and sequentially open on a user's computer screen as the user is "surfing the net" or otherwise using his or her computer—for example when an AOL or Yahoo instant message is received. VanDeVelde Dec. at ¶ 3. Rather than "inserting" a window in or on an Overstock Web site, as Plaintiff alleges (*see* Complaint at ¶¶ 3, 40), the appearance of the advertising window, like any other window, is akin to placing a magazine on top of the morning newspaper; the magazine thus covers a portion of the newspaper page (which may be subject to copyright protection) but it does not alter the newspaper. Removing the magazine, like closing the advertising window, reveals the full newspaper page once again. Plaintiff's complaint does not and cannot make any allegation inconsistent with this fundamental

keyboard combinations to move rapidly through Windows Operations."): Paul McFedries. *The Complete Idiot's Guide to Windows Millennium* 49 (2000) ("Windows gets its name because . . . each program that you launch shows up on the screen in a box, and that box is called a *window.* ").

understanding of how TGC's software operates in the Windows environment.

Plaintiff filed its 29-page complaint[6] on June 26, 2003, alleging seven causes of action. However, when the conclusory legal allegations and clearly false assumptions under the complaint are properly set aside, Plaintiff's complaint fails to state a claim upon which relief may be granted. Defendant's arguments, detailed in this memorandum, are summarized as follows:

Counts I - II (Federal Trademark Infringement,  Unfair Competition/False Designation of Origin): Plaintiff's trademark is not displayed and does not appear on any advertisements generated by TGC's software, and Plaintiff has failed to allege that TGC is *using* any of Plaintiff's trademarks in commerce –- a fundamental requirement for trademark infringement and unfair competition. Thus, TGC is neither infringing any of Overstock's alleged trademarks, nor unfairly competing with Plaintiff under trademark laws.

Count III (Intentional Interference With Economic Relations):Even assuming that the other elements of this tort are fulfilled by the complaint's allegations, Plaintiff has not alleged any conduct that remotely approaches the type of improper means or conduct required to sustain a claim for tortious interference;

Count IV (Unjust Enrichment): "Unjust enrichment" is not a license for a claimant to pursue any practice it perceives or characterizes as "unjust," and this legal doctrine is not applicable to any of the facts properly pled in the Complaint;

Count V (Common Law Unfair Competition):In the context of this case, common law unfair competition, like its federal counterpart, depends upon TGC's use of Plaintiff's trademark or a mark confusingly similar thereto in commerce in Utah. There has been and can be no evidence of such use

---

[6]TGC denies many of the allegations in the Complaint but, for the purposes of this motion, assumes the truth of the factual allegations properly pled.

and these claims therefore also fail;

Counts VI and VII (Trespass to Chattels and Conversion of Chattels): The allegations supporting these claims necessarily depend on a false and impossible premise under the circumstances–that TGC inserts or imposes its own advertising or the advertisements of its clients on Overstock's Web site, in violation of Overstock's proprietary interest in its own Web site. These claims suggest a misunderstanding of the nature of a "Web site" in the first place and (more importantly) the function of TGC's windows on a consumer's computer screen. The claims that TGC's activities in fact constitute a physical (or even a virtual) trespass to or conversion of a Web site is simply contrary to Internet fact and computer function of which this Court should take judicial notice. TGC's "pop-up" or "pop-over" windows appear on the user's computer screen without "touching" Plaintiff's "Web site," resident server, or even the transmission of Plaintiff's Web site information to the user's computer. Like two magazines on a table, both windows appear on the user's computer screen–each without relying on the process or creation (printing) of the other–and are subject to separate control (and closure) by the user at the user's will. Under the circumstances, there simply can be no trespass or conversion, as plaintiff envisions and alleges, as a matter of law.

## ARGUMENT

### I.   THIS CASE SHOULD BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER TGC.

#### A.   Plaintiff Has The Burden Of Proving That The Court's Exercise Of Personal Jurisdiction Is Proper.

To obtain personal jurisdiction over a nonresident defendant, the plaintiff has the burden of proving that jurisdiction is legitimate under Utah's long arm statute and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *See Anderson v. American Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990), *cert. denied,*

-7-

502 U.S. 900 (1991).

Personal jurisdiction can be either general or specific. A defendant is subject to general jurisdiction under Utah law if it is physically present within the state or is "conducting substantial and continuous local activity." *Arguello v. Industrial Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992). A non-resident defendant is subject to specific jurisdiction when it "purposefully establishes sufficient minimum contracts with the forum state, the cause of action arises out of these contacts, and jurisdiction is constitutionally reasonable. *See iAccess, Inc. v. Webcard Technologies, Inc.*, 182 F.Supp.2d 1183, 1186 (D. Utah 2002), citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985).

A plaintiff has the burden of alleging facts in the complaint sufficient to establish personal jurisdiction over a defendant. If, however, the defendant controverts those allegations by affidavit, then the plaintiff cannot stand on the allegations of the complaint but rather has the burden to come forward with evidence sufficient to establish a prima facie case of personal jurisdiction. *See Anderson*, 807 P.2d at 827. Plaintiff's allegations of facts ("on information and belief") in paragraph 11 of its complaint fail to support its jurisdictional claims in the face of the affidavits furnished on behalf of TGC herewith and under applicable law.

**B.     This Court Does Not Have Specific Jurisdiction Over TGC.**

The evaluation of specific jurisdiction requires a three-part inquiry: 1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; 2) a nexus must exist between the plaintiff's claims and the defendant's acts or contacts; and 3) the application of the Utah long-arm statute must satisfy the requirements of federal due process. *See Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999) . Utah's long-arm statute provides in pertinent part:

-8-

Any person ... who in person or through an agent does any of the following enumerated acts, submits himself to the jurisdiction of the courts of this state as to any claim arising out of or related to:

    1) the transaction of any business within the state;

    2) the contracting to supply goods or services to the state;

    3) the causing of any injury within this state whether tortious or by breach of warranty . . .

(§ 78-27-23 Utah Code Annotated.)

Plaintiff's complaint suggests claims obviously calculated to invoke all three of the noted categories of claims under the long arm statute, but discounted by defendant's affidavits. While there is reason to dispute exposure under each category, it is also possible to avoid any factual dispute over the nature of TGC's activities by focusing first on the due process analysis and the required "minimum contacts" with the forum. As this Court has noted, it is "frequently helpful to undertake the due process analysis first, because any set of circumstances that satisfies due process will also satisfy the long-arm statute." *System Designs, Inc. v. New Customvare Co., Inc.*, 2003 U.S. Dist. LEXIS 3271 (D. Utah March 5, 2003). It is clear under such an analysis that TCC's contacts with the State of Utah do not satisfy the "minimum contacts" test.

The Due Process Clause requires that the defendant have sufficient "minimum contacts" with the forum state to satisfy the concept of fair play and substantial justice. A proper analysis of minimum contacts focuses on the relationship among the defendant, the forum, and the litigation. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Minimum contacts must have a basis in some act by which the defendant purposefully avails itself of the privilege of conducting activities in the forum state, thus invoking the benefits and privilege of its laws. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The requirement of "purposeful availment" ensures that the

-9-

defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). This requires a showing in this case that TGC deliberately created a relationship with the State of Utah that would serve to make Utah's exercise of jurisdiction foreseeable. In other words, TGC must have "expressly aim[ed]" its actions at this forum (*OMI Holdings*, 149 F.3d at 1091-92) or "intentionally direct[ed]" its activity at Utah residents. *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995)(citations omitted).

Plaintiff alleges unlawful activities by TGC that were "in whole or in part, carried out, made effective, and caused injury within the Central District of Utah." (Complaint at ¶ 11.) It apparently refers to its various claims related to TGC's Internet-based advertising activities, since the Complaint identifies nothing other than TGC's "virtual" contacts with the State by means of Internet-based advertising "pop-ups" on the computers of its subscribers, some of which are apparently presumed to be in Utah. Plaintiff's complaint also suggests that TGC's activities have caused tortious injury in Utah, including injury suffered by Overstock. Finally, Plaintiff alleges that TGC "regularly conducts or solicits business within this District and elsewhere in Utah and derives substantial revenue from the installation of its software products and/or providing services within this District and elsewhere in Utah." *Id.*

Evaluating specific personal jurisdiction in "Internet cases" ultimately requires a "particularized inquiry" of the facts surrounding the Internet-based presence in this State. *See Far West Capital, Inc. v. Towne*, 46 F.3d 1071 (10th Cir. 1995). This is true under the approaches recognized in leading cases–the "sliding scale" test explained in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123-24 (W. D. Pa. 1997) and the "something more" standard first articulated in *Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295 (S.D.N.Y. 1996), *affirmed* 126 F.3d 25 (2nd Cir. 1997); *iAccess, Inc.*

-10-

*v. Webcard Technologies, Inc.*, 182 F.Supp.2d 1183, 1186 (D. Utah 2002).  Under either approach, plaintiff must demonstrate that TGC purposefully directed its activities in a substantial way toward Utah to find personal jurisdiction.  As the *Bensusan* court explained, in language acknowledged and adopted by this Court, "Creating a [Web]site, like placing a product into the stream of commerce, may be felt nationwide–or even worldwide–but, without more, it is not an act purposefully directed toward the forum state."  937 F.Supp. at 301, quoted in *System Designs, Inc.  v. NewCustomware Co., Inc.*, 2003 U.S. Dist. LEXIS 3271,*38 (D. Utah 2003).  In other words, this court may exercise specific jurisdiction over TGC only if it finds that TGC (1) directed electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates a potential cause of action in the State. *Id.*

However, TGC has done nothing to direct electronic activity into Utah with the deliberate intent to engage in business here. According to Plaintiff, TGC's electronic activities consist generally of the existence of a Web site, the placement of pop-up advertisements on computers of subscribers, including some who are alleged to be Utah residents, and the offering of advertising services to corporations and individuals, including some who may be in the State of Utah. However, none of these alleged activities is sufficient to establish personal jurisdiction against TGC..

First, TGC's Web site, www.gatorcorporation.com ("Web Site"), provides information about TGC's software applications and services, including the GAIN software. As noted above, it is well established that the mere presence of a Web site accessible by forum residents is insufficient to establish personal jurisdiction.

Second, the fact that GAIN software may exist on subscribers' computers in Utah is not the result of activities directed specifically toward Utah.  TGC has never targeted consumers in Utah for

-11-

TGC software distribution through the Web Site or through any other means. Weisman Dec. at ¶ 4. TGC subscribers typically obtain TGC software either through TGC Internet advertising, which is not in any way directed specifically toward Utah, or through third party distributors, all of whom are located outside of Utah. Weisman Dec. at ¶ 5. Neither of these activities is directed at the forum state. All of the companies with whom TGC has software distribution agreements are located outside of Utah. The mere fact that TGC advertises worldwide on the Internet is not sufficient to establish jurisdiction. *See iAccess v. Webcard Technologies, Inc.*, 182 F. Supp.2d 1183 (D. Utah 2002).

Third, over the period of TGC's business activities, it has had contracts with only a few Utah-located advertisers, accounting for less than 0.7% of TGC's total revenue over a four-year period. In fact, it currently has only one Utah-based advertising client, generating $7,500 in revenue for TGC in 2003, or less than two-hundreths of one percent (0.02%) of TGC's revenue. VanDeVelde Dec. at ¶ 6. (By the very nature of TGC's services, its clients are generally Internet-based advertisers, whose presence in Utah is fortuitous, in any event.)

The fact that TGC's software may have ended up on the computers of Utah residents through no effort of TGC directed to Utah specifically or distinguished from TGC's nationwide or world-wide Internet promotion, is insufficient to establish the required "substantial" intent and activity to engage in specific business or interaction with the forum state. There is no justification for invoking specific personal jurisdiction in this case.

### C.   This Court Does Not Have General Jurisdiction Over TGC.

To establish general jurisdiction over a defendant, the defendant's activities in the state must be continuous and systematic–sufficient in fact to support a conclusion that the defendant is actually and actively "doing business" in Utah. The Utah Court of Appeals has identified twelve factors that

are relevant to the issue of general personal jurisdiction:

> Whether the corporation defendant is: 1. engaged in business in the state; 2. licensed to do business in the state; 3. owning, leasing, or controlling property (real or personal) or assets in this state; 4. maintaining employees, offices, agents, or bank accounts in this state; 5. present in that shareholders reside in this state; 6. maintaining phone or fax listings in this state; 7. advertising or soliciting business in this state; 8. traveling to this state by way of salespersons, etc.; 9. paying taxes in this state; 10. visiting potential customers in this state; 11. recruiting employees in this state; 12. generating a substantial percentage of its national sales through revenue generated from instate customers.

*Soma Medical International v. Standard Chartered Bank,* 196 F.3d 1292, 1295-96 (10th Cir. 1999)

(quoting *Buddensick v. Stateline Hotel, Inc.,* 972 P.2d 928, 930-31 (Utah Ct. App. 1998)).

Plaintiff's complaint in this case does not allege or detail TGC's activities in Utah sufficient to support a conclusion of general jurisdiction, but alleges loosely and "on information and belief" only that "[TGC] regularly conducts or solicits business within this District and elsewhere in Utah and derives substantial revenue from the installation of its software products and/or providing services within this District and elsewhere in Utah." (Complaint at ¶ 11.) None of the factors relevant to a consideration of general jurisdiction are satisfied in fact.

TGC has no property or operations in Utah. Weisman Dec. ¶ 7. It is true that TGC received revenue from Overstock itself, under an advertising contract in place during 2001 and part of 2002 for the very Internet "pop-up" advertising service of which Overstock now complains. However, the total revenue from TGC's contracts with Overstock and the few additional advertising clients who had some presence in this state over the period of TGC's business represents a mere seven tenths of one percent (0.7%) of all revenues earned by TGC since 2000. VanDeVelde Dec. at ¶ 5. TGC's 2003 revenue from its single Utah-located advertising customer is a mere two hundreths of one percent (0.02%) of its overall 2003 revenue. Moreover, the fact that Overstock or any of the few other advertising clients are or were located in Utah was merely fortuitous, as TGC provides Internet-based services, to which

-13-

geographical location is generally unimportant. VanDeVelde Dec. ¶ 6. (It is also important to note that Overstock's present lawsuit is unrelated to its earlier contract or relationship with TGC; hence that contract does not of itself support any special or general jurisdiction).

TGC's revenue depends on its advertising customers. VanDeVelde Dec. ¶ 5. TGC's subscribers obtain the GAIN software free of charge, and TGC has no distributors in Utah. Weisman Dec. at ¶ 5-6. As a matter of law, *de minimis* revenue in the forum state cannot provide the basis for the exercise of personal jurisdiction. *See Wolf v. Richmond County Hospital Authority*, 745 F. 2d 904, 909-12 (4th Cir. 1984) (defendant's contacts with the forum state, including receipt of one-fifth of its income from the forum, were *de minimis* and insufficient to support general jurisdiction).

The only contact TGC currently has with Utah is one advertiser (VanDeVelde Dec at ¶ 6) and the fact that a minimal fraction of TGC's approximately 35 million worldwide subscribers, may reside in Utah. This is wholly insufficient to establish general jurisdiction. *See. e.g.. Haas v. A.M King Industries, Inc.*, 28 F.Supp.2d 644, 650 (D. Utah 1998) (no general jurisdiction where total sales in forum state are less than one percent of total national sales); *see also Moinlycke Health Care AB, v. Dumex Medical Surgical Products Ltd.* 64 F. Supp.2d 448. 453 (D. Pa. 1999) (no general jurisdiction where there is no indication that forum state is "an essential part of the conduct of [defendant's] business," defendant has "no regular place of business" in the forum state, and defendant has "sold less than one percent of its product line in this state.").

In short, there is no basis to establish general jurisdiction over TGC because TGC does not have continuous and systematic activities in the forum state sufficient to establish general jurisdiction. Thus, the Court should dismiss the complaint for lack of personal jurisdiction against TGC.

**II.   THE COURT SHOULD DISMISS THE COMPLAINT UNDER 12(b)(6) BECAUSE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST TGC.**

**A.   The Court Should Dismiss Plaintiff's Federal Trademark Infringement And Related Claims Of Unfair Competition (Counts I; II; V).**

It is black letter law that there can be no trademark infringement without use in commerce by the defendant of the plaintiff's mark or a mark confusingly similar thereto. *See* 15 U.S.C. § 11 14(1)(a) & (b) (cause of action for infringement requires proof that reproductions or colorable imitations of a registered mark were "use[d] in commerce" or applied to materials "intended to be used in commerce"); *see also Universal Money Centers, Inc. v. AT&T Co.*, 22 F.3d 1527, 1529 (10th Cir.), *cert denied*, 513 U.S. 1052 (1994). Similarly, a fundamental element for the claims of unfair competition and "false designation of origin" under the Lanham Act is a defendant's use in commerce of a mark the same as or similar to the Plaintiff's mark. *See* 15 U.S.C. § 1125(a) (federal unfair competition requires proof of "use [] in commerce [of] any word, term, name, symbol, or device . . ."; *GTE Corp. v. Williams*, 649 F. Supp. 164, 166 (D. Utah 1986)(claims based on false designation of origin "prohibits the use of words or symbols that tend falsely to describe or represent the source or origin of goods or services in commerce.")

Plaintiff does make the conclusory allegation that there is "use in commerce," that is, the words "use in commerce" appear in various paragraphs of Plaintiffs complaint. However, Plaintiff cannot avoid dismissal by pleading bare legal conclusions. Only well-pleaded facts, as distinguished from conclusory allegations, must be taken as true, for purposes of considering motions to dismiss. *Dunn v. White*, 880 F.2d 1188, 1190 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059, 110 S. Ct. 871, 107 L. Ed. 2d 954 (1990). Conclusory allegations are not facts. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998); *See also, Faulkner Adver. Assoc. Inc. v. Nissan Motor Corp.*, 945 F.2d

-15-

694. 695 (4th Cir. 1991) ("[A] court cannot be shackled from granting a motion to dismiss merely because [a party] propounds a legal conclusion, where the defects of the conclusion are conspicuous from the facts asserted.").

Tellingly, Plaintiff does not allege that any of the pop-up or pop-under ads actually contain copies, imitations or unauthorized versions of Plaintiffs trademarks—because they do not. On this crucial point, the only fact Plaintiff alleges (repeatedly through its complaint) is that Defendant places unauthorized pop-up or pop-under advertisements "on the Overstock Web sites." (*See, e.g.*, Complaint at ¶ 73(emphasis added))–a technically- and factually-flawed attempt to describe the creation of a new window on top of or overlapping the separate window displaying Overstock's Web page. However it may be described, the generation of a new window on the user's computer screen is not the "use" of any trademark in another window. Without alleging actual use of the marks in commerce, it is impossible to state a claim for trademark infringement, unfair competition, dilution or any other claim under the Lanham Act.. Allowing Plaintiff's suit to proceed without this fundamental allegation of use is contrary to basic Lanham Act jurisprudence, and would expand the Lanham Act almost infinitely. Because Plaintiff has failed to allege facts to show that TGC makes commercial use of any of Plaintiffs marks in commerce or that there is cognizable trademark confusion.

**B.    The Court Should Dismiss Plaintiff's Intentional Interference With Economic Relations Claim (Count III).**

To sustain a claim for intentional interference with economic relations, a plaintiff must establish: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982); *see also Mumford v. ITT Commercial Finance Corp.*, 858 P.2d 1041, 1044 (Utah App. 1993). To sufficiently plead the

first element of a claim for interference with contractual relations, a plaintiff cannot rest on conclusory allegations that it has existing or potential economic relations. The element requires a plaintiff to allege facts showing either an existing contract or business relationship with a third party, or a potential contract or business opportunity with a third party or an identifiable class of third persons. *See St. Benedict's Development v. St. Benedict's Hospital*, 811 P.2d 194, 201 (upholding a trial court's dismissal of a claim for interference with present contractual relations because: "There [was] no allegation in the complaint that any existing sublease between the development company and its tenants was breached or that the performance under any of those subleases was in any way impaired by Defendants' actions."). The complaint in this case fails to allege facts to show the existence of any economic relations.

Furthermore, plaintiff has failed to plead in other than conclusory language either improper purpose or improper means - the necessary second element of the tort. As this Court recognized in *Gull Laboratories, Inc. v. Diagnostic Technology, Inc.* 695 F. Supp 1151 (D. Utah 1988), it is not actionable and intentional interference to contact a competitor's potential customers. *Id.* at 1155 (*citing Robbins v. Ogden Corp.*, 490 F. Supp. 801, 811 (D.C.N.Y. 1980), *Environmental Planning and Information Council of Western El Dorado County, Inc. v. Superior Court*, 680 P.2d 1086, 1090, (Cal. 1984), and *Edwards v. Anaconda Co.*, 115 Ariz. 313, 565 P.2d 190, 192 (1977). As this Court further noted, "Competition is a major privilege justifying interference with economic advantage, and competitors are not liable for interference with contract if the interference advances the competitors' own interest and is not otherwise unlawful." *Gull Laboratories*, 695 F. Supp. at 1155 (*citing Seven Star Shoe Co., Inc., v. Strictly Goodies, Inc.*, 657 F. Supp. 917, 920 (S.D.N.Y. 1987); *Nifty Foods Corp. v. A & P*, 614 F.2d 832, 838 (2d Cir. 1980). Plaintiff must demonstrate that Defendant's

predominant motivations were specifically to injure plaintiff. There is no liability where the challenged conduct is both lawful and reasonably related to the creation or protection of a legitimate business interest of the defendant.

It strains reason to claim that generating an advertisement that appears below or under a Web page on a computer screen or that partially or temporarily obscures a Web page, requiring a customer to execute a single mouse click, is so lacking in "justification" as to fulfill the necessary elements of this claim. Even assuming that the other elements of tortious interference could be proven by Plaintiff, the Complaint states no facts from which a trier of fact could properly conclude that the TGC's conduct "admits of no motive other than malice." *See Filmar Racing, Inc. v. Stewart,* 541 S.E.2d 733, 738 (affirming 12(b)(6) dismissal on these grounds).

**C.    The Court Should Dismiss Plaintiff's Unjust Enrichment Claim Because Plaintiff Rendered No Services To TGC And TGC Did Not Request Or Accept Any Services From Plaintiff For Which It Expected To Pay (Count IV).**

The concept of unjust enrichment and the related theory of *quantum meruit,* provide that when one party confers a "benefit" to another who consciously understands or knows of the benefit and accepts it "under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Berrett v. Stevens,* 690 P.2d 553, 557 (Utah 1984). The remedy is one of restitution designed to restore to a plaintiff a benefit unjustly enjoyed by a defendant, *Commercial Fixtures & Furnishings, Inc. v. Adams,* 564 P.2d 773, 776 (Utah 1977) and plainly deals with situations comparable to (but for some reason falling short of) a legally binding contract. *See American Towers Homeowners Association v. CCI Mechanical,* 930 P.2d 1182, 1193 (Utah 1996) (noting that the doctrine is designed to provide an equitable and "quasi contractual" remedy where one does not exist at law.) This cause of action is wholly inappropriate to the case Plaintiff has plead to this Court.

Plaintiff's Complaint does not allege any course of dealings between itself and Defendant from which a fact finder could properly find the elements necessary to even a prima facie claim.

In addition, taking Plaintiff's claims to their logical conclusion would result in unjust enrichment liability for all operators of Internet Web pages that link to other Web pages' content. Search engines like Yahoo! and Google would be particularly impacted. This claim is so overreaching that if allowed, the Internet would drown in a sea of 'unjust enrichment" lawsuits. For these reasons, the Court should dismiss this claim.

**D.    Plaintiff's Claims For Trespass And Conversion Of Chattels Should Be Dismissed (Counts VI; VII).**

The "General Allegations" of Plaintiff's Complaint include broad claims that TGC's advertising scheme is "based on a 'Trojan horse' concept," by which users (as allegedly "unsuspecting consumers") are induced to download and install free but generally useless software that allows "[TGC] to then trespass on the personal computer ('PC') of the person who downloaded the software in order to perpetrate its unlawful pop-up/under advertising scheme." (Complaint at ¶¶34-37.) It further alleges that, with software thus installed on users' computers, TGC is "able to view each Web site visited by the consumer" and, by means of the alleged installation of additional software on the user's computer, is notified of the consumer's Web-site "visits" and is able to determine consumer preferences, which then guide the pop/up under advertisements."

Even if all this is deemed true for purposes of this motion (which TGC does not concede), these allegations of unauthorized use of or intrusion into a third-party user's personal computer do not support an independent claim by Overstock. Overstock has no standing to assert claims that TGC's users may or may not have relative to their own computers (as a type of chattel).

Aside its lack of standing for any claim based on its "Trojan horse" allegations, however,

Plaintiff alleges no fact supporting a claim of either trespass or conversion of its "chattel." In fact, Overstock's efforts to define the trespass and conversion claims depart markedly from the general allegations of the Complaint and attempt to describe trespass on or conversion of Overstock's "Web site"- as if the consumer's viewing of the Web site itself were a physical place or qualified as chattel. It does not. When a consumer views a Web site on a personal computer, it sees nothing more than the manifestation of an electronic signal sent from a computer Web server to an individual's personal computer. Some courts have held that the unauthorized use of the bandwidth or storage capacity of another's Web server may constitute a trespass to chattel. *Ebay, Inc., v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1071 (N. D. Cal. 2000). However, Plaintiff's complaint does not allege that TGC's pop-up advertisements in any way use, intrude upon or otherwise "touch" or affect the bandwidth or storage capacity of Plaintiff's Web servers. Plaintiff does not allege that TGC sends any electronic signals of any kind through or by means of any of plaintiff's computer systems whatsoever, that any of Defendant's software is injected into or occupies any of Plaintiff's computer hardware, or that TGC's pop-up advertisements in any way touch any physical property owned or controlled by plaintiff. In fact, allowing claims against TGC on allegations that it is "trespassing" "on a Web site," based on the pop-up windows appearing on a user's computer, would open the door to claims for conversion and trespass against any Internet user who, while viewing plaintiff's Web site, chooses to open up another Web site in a window overlapping or on top of plaintiff's Web site.

Even if plaintiff's Web site were properly treated as chattel, which it is not, plaintiff fails to allege the basic elements needed to recover for trespass of chattel. Trespass to chattels "lies where an intentional interference with the possession of personal property has proximately caused injury" *Thrifty-Tel, Inc., v. Bezenek*, 46 Cal.App.4th 1559, 1566 (Cal Ct. App. 1996). "A basic element of

-20-

trespass to chattel must be physical harm to the chattel . . . or some obstruction of its basic function . . . ." *Intel Corp. v. Hamidi*, 1 Cal.Rptr. 3d 32, 43, (Cal. 2003). Plaintiff does not allege any physical harm to or obstruction of its computer systems. Nor does Plaintiff allege that TGC's actions prevent the basic function of its computer systems, where its "Web site" resides.

Plaintiff's claim for conversion of chattel fails for the same essential reason–the failure to claim any loss to or impact on physical property. The conversion tort provides a remedy for the loss of an intangible property interest only if such interest is reflected in something tangible that can be physically taken. *See, Thrifty-Tel, Inc., v. Bezenek*, 46 Cal.App.4th 1559, 1565 (Cal Ct. App. 1996). "For example, the value of a stock certificate is not the cost of the paper, but the intangible interest it represents. When the certificate is stolen or placed in another's name without the owner's permission, the value of the loss is not the cost of the paper-- a tangible--but the worth of the stock--an intangible." *Id.* "Similarly, an individual who misappropriates a floppy disk which contains trade secrets, protected formulas, or customer lists may be liable for conversion, based on the value of the information on the disk, not the *de minimis* price of the disk." *Id.* In each instance, however, the conversion of the value of an intangible recorded or tied to a tangible medium. Plaintiff's Complaint does not allege that TGC has physically taken or improperly appropriated any tangible property. (In fact, there has been no taking of even an intangible, as Plaintiff's Web site remains its own, resident on its servers and transmitted to any user "accessing" it.) Plaintiff has alleged no facts supporting a claim for conversion of chattels.

## III.   ALTERNATIVELY, THE COURT SHOULD ORDER TRANSFER OF THIS CASE TO THE NORTHERN DISTRICT OF CALIFORNIA.

Plaintiff's sole basis for placing venue of this action in the District of Utah is that "[TGC] resides in this district within the meaning of 28 U.S.C. § 1391(c), which defines residence in terms of

being subject to personal jurisdiction at the time the action is commenced.  TGC challenges the allegation and conclusion of personal jurisdiction.

However, even if this Court determines that it has at least colorable personal jurisdiction over TGC, and that dismissal is not appropriate at this time on other grounds argued above, the case (or any portion of it that remains after pending MDL proceedings) should be transferred to the Northern District of California, where Defendant is in fact a resident, and as the venue more appropriate to and convenient for Defendant and the various witnesses involved in this case.

A district court may transfer a case, in its discretion, to a district where it might otherwise have been brought "for the convenience of the parties and witnesses, in the interest of justice." 28  U.S.C. § 1404(a).  District courts have broad discretion in determining whether to grant motions to transfer venue. *See Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991). In determining whether a case should be transferred under section 1404(a), the district court must "weigh in the balance a number of case-specific factors." *Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  These factors include the following: "the plaintiff's initial choice of forum; the residence of the parties; the relative ease of access of proof; the availability of compulsory process for attendance of witnesses; the costs of obtaining attendance of willing witnesses; the possibility of a view; the enforceability of a judgment, if obtained; the relative advantages and obstacles to a fair trial; other practical problems that make a trial easy, expeditious and inexpensive; the administrative difficulties of court congestion, the interest in having localized controversies settled at home; and the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action." *Recovery Processes Int'l v. Hoechst Celanese Corp.*, 857 F. Supp. 863 (D. Utah 1994), quoting *McDevitt & Street Co. v. Fidelity & Deposit Co. of Maryland*, 737 F. Supp. 351,

534 (W.D.N.C. 1990); *also, Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir. 1967).

A balancing of all relevant factors supports a transfer to the Northern District of California as the more convenient forum.

**A.     The Convenience Of The Parties And Witnesses And The Relative Cost Of Obtaining Attendance Of Witnesses Favors The Northern District Of California.**

In considering the convenience of the parties and witnesses, the courts look at the location of witnesses and evidence and the relative cost of litigation.  Both of these factors favor transfer to the Northern District of California.

**i.     Location of Witnesses and Other Evidence.**

Most of the relevant witnesses and evidence in this case are located in the Northern District of California.  The central issue in this case is whether Defendant's GAIN software and services operate in a manner that infringes Overstock's trademarks and related rights.  Most of the alleged infringing acts occurred in the Northern District of California, where TGC's business and servers are located. Jeff McFadden Declaration ¶ 3. ("McFadden Dec.) The majority of individuals who designed and implemented the alleged infringing software are located in the Northern District of California. *Id.* The GAIN computer servers, databases, and hardware that perform the activities complained of are located in the Northern District of California.  *Id.*  The Northern District of California is unquestionably the physical hub of the alleged wrongful activity in this action.  By contrast, since this case primarily involves TGC's activities, and its alleged impact on Overstock and its alleged Internet customers, there will be comparatively few witnesses and little or not physical evidence located in Utah.

**ii.     Relative Costs of Litigation**

In general, "the court should consider the parties' respective residences and their ability to bear

-23-

the costs of litigating in a particular forum." *Allied Van Lines, Inc. v. Aaron Transfer and Storage, Inc.*, 200 F. Supp.2d 941, 947 (N.D. Ill. 2002).

Overstock is a publicly-traded entity, founded (according to its Web site) in 1999. Although relatively new, its reported revenue for the twelve-month period ending June 30, 2003, exceeded $123 million, based on filings with the U.S. Securities and Exchange Commission.[7] According to its Web site, it has 175 employees.

TGC is a privately held, emerging company, with approximately 150 employees. VanDeVelde Dec. at ¶ 2. TGC has no property or operations in Utah. McFadden Dec. at ¶4. It creates more of a financial burden for TGC to appear in Utah, with its witnesses and evidence, than for Overstock to appear in California. The balance of convenience to the parties and witnesses favors transfer of this case, on any remand from the MDL, to the Northern District of California.

**B.     The Local Interest Of The Controversy Favors Transfer To The Northern District Of California.**

When considering which forum has the prevailing interest in a controversy over Internet activities, courts generally look to the "activities of the alleged infringer, its employees, and its documents; therefore, the location of the infringer's place of business is often the critical and controlling consideration." *Interlochen Center for the Arts v. Interlochen International Camp. Inc.*, 2002 WL 31040346, *5 (N.D. Ill. 2002). As noted above, the Northern District of California is the location of the alleged infringing activity and the alleged infringer's documents, computers and witnesses are all located in that district.

The Northern District of California also has a substantial interest in this controversy as the

---

[7]A true and correct copy of Overstock's Form 8-K, dated July 31, 2003, obtained through public links on Overstock's Web site, is attached hereto as Exhibit D.

-24-

location of the alleged infringing activities. By contrast, Utah's interest is minimal, given that the users of the software and services of which Overstock complains are allegedly located throughout the world and have contact or connection with Overstock only over the Internet. Weisman Dec. at ¶2. The controversy has far-reaching implications for Internet enterprises that are by no means unique to either Utah or California. Under the circumstances, and absent a proper "virtual" forum equivalent to the "virtual" world of Internet transactions, the prevailing local interest in this controversy resides in the Northern District of California, as the situs of the alleged infringements or other allegedly wrongful activities.

**C.     The Accessibility Of Proof Favors The Northern District Of California.**

Courts have recognized that "although the comparatively low cost of transporting documents makes their location a less pressing consideration in deciding [a motion to transfer] . . . the presence of the bulk of the relevant materials in [a particular state] also militates in favor of transfer." *Pennwalt Corp. v. Purex Industries, Inc.*, 659 F. Supp. 287, 290 (D. Del. 1986). Since most of the sources of proof in this case are located in the Northern District of California, this factor favors transfer of the case from this district, as well.

**D.     The Interests Of Justice Favor The Northern District Of California.**

An "interest of justice" analysis properly includes "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to the premises that might have to be viewed, the possibility of an unfair trial, the ability to join other parties, and the possibility of harassment." *Acterna LLC v. Adtech, Inc.*, 129 F. Supp.2d 936, 940 (E.D. Va. 2001). In *Recovery Processes Int'l v. Hoechst Celanese Corp.*, 857 F. Supp. 863 (D. Utah 1994), this Court considered "most compelling" in its decision to transfer a case from Utah to South Carolina those facts "regarding

the ongoing litigation in South Carolina covering the same subject matter as this lawsuit." *Id.* at 886.

There are currently pending against TGC more than twelve separate lawsuits filed by different plaintiffs claiming rights to remedies similar to those claimed by Overstock in this case. Most have been consolidated for purposes of pre-trial under MDL proceedings in the District of Georgia, as the district of the U.S. District Judge assigned by the Judicial Panel for Multidistrict Litigation ("JPML"). Those that have not yet been transferred and consolidated (such as the present action) are subjects of tag-along requests and a Conditional Transfer Order issued by the JPML on August 1, 2003.

Of the cases consolidated before the MDL, four were originally filed in the U.S. District Court for the Northern District of California: *The Gator Corporation v. L.L. Bean, Inc.*, (N.D. Cal. Case No. 3:01-1126); *The Gator Corp. v. Extended Stay America, Inc.*, (N.D. Cal. Case No. 3:02-5266); *The Gator Corp. v. PriceGrabber.com, Inc.*, (N.D. Cal. Case No. 3:02-5834); and *The Gator Corp. v. TigerDirect, Inc.*, (N.D. Cal. Case No. 3:02-5875). A fifth case, *True Communication, Inc., d/b/a Metrodate.com v. The Gator Corp.*, originally filed in California Superior Court (San Mateo County) was removed to the Northern District of California and ultimately also consolidated before the MDL. The court for the Northern District of California is thus familiar with the issues raised generally in this case, as well, and judicial economy alone favors transfer of this action to that district, as well.

The essential purpose of the present transfer motion (in the event this case is not altogether dismissed) is both to preserve the issue of proper venue and to urge transfer to the Northern District of California of any post-MDL proceedings on remand from the JPML. Similar motions are pending in each of the other lawsuits currently consolidated in the MDL. These unique circumstances, including not only the barrage of litigation against TGC but the potential (absent transfers to a common and qualifying venue for purposes of any post-MDL proceedings) militate compellingly in favor of

transfer of this case to the Northern District of California.

## CONCLUSION

Plaintiff is objecting to the very essence of the Internet and the competitive freedom on which Plaintiff's own business model so heavily relies. While it would be lucrative for Plaintiff to deny computer users control of their own computers and screens, there is no basis for its current action against TGC. TGC's business activities are entirely lawful; plaintiff's complaint fails on its face, on both jurisdictional and procedural grounds. Therefore, TGC respectfully requests that this Court dismiss all of Plaintiff's claims with prejudice.

Respectfully submitted, this the ___ day of August 2003.

SNOW, CHRISTENSEN & MARTINEAU

David W. Slaughter
Attorneys for The Gator Corporation

OF COUNSEL:

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Kent R. Raygor
Paul S. Malingagio
David Garcia

THE GATOR CORPORATION
L. Scott Primak, Esq.

2:03cv569

(8)

# EXHIBIT "A"

DAVID W. SLAUGHTER (A2977)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
Facsimile No.: (801) 363-0400

SHEPPARD, MULLIN, RICHTER & HAMPTON
KENT RAYGOR, Cal. Bar No. 117224
PAUL S. MALINGAGIO, Cal. Bar No. 90451
DAVID GARCIA, Cal. Bar No. 151349
333 South Hope Street
Forty-Eighth Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398

THE GATOR CORPORATION
L. SCOTT PRIMAK (Cal. Bar No. 152353)
2000 Bridge Parkway, Suite 100
Redwood City, California  94065
Telephone: (650) 232-0300
Facsimile: (413) 828-3071

Attorneys for Defendant The Gator Corporation

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| OVERSTOCK.COM, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE GATOR CORPORATION, a Delaware corporation, and WHENU.COM, INC., a Delaware corporation,<br><br>Defendants. | **DECLARATION OF SCOTT VANDEVELDE IN SUPPORT OF DEFENDANT GATOR'S MOTION TO DISMISS**<br><br><br><br>No. 2:03 CV 00569 TS<br><br>Judge Ted Stewart |

I, Scott VanDeVelde, declare as follows:

1.        I am the Vice President of Sales for Defendant The Gator Corporation ('TGC").
I have held this position since March 2000. I make this declaration from my own personal
knowledge and from TGC's business records maintained or reviewed in the normal course of
business.

2.        TGC is a small, privately held, emerging company located in Redwood City,
California, which is in the Northern District of California. TGC has approximately 150
employees. Founded in 1998, TGC is a developer and distributor of innovative software products
and also offers online advertising services.

3.        TGC offers to its clients, through a software service called the Gator Advertising
and Information Network ("GAIN'), a highly effective means to advertise to consumers whose
computers are connected to the Internet by applying contextual marketing concepts that allow it
to deliver highly relevant advertising directly to the consumer's computer. This type of
advertising is sometimes known as "pop-up" advertising as the ads typically appear in the form
of small windows on the consumer's computer screen when the user accesses the Internet. These
"pop up" windows are no different from the many other windows that periodically and
sequentially open on a user's computer screen as the user is "surfing the net" or otherwise using
his or her computer—for example when an AOL or Yahoo instant message is received.

4.        Once the software is installed as requested by the subscriber, it resides on the
subscriber's computer and causes advertising windows to pop up on the user's screen display.
Subscribers may close the advertising window by clicking an "X" in the upper right hand corner,

-2-

which will reveal the underlying text on the user's computer screen. The appearance of the advertising window is akin to placing a magazine on top of the morning newspaper–the magazine covers a portion of the newspaper page, which may be subject to copyright protection, but it does not alter the newspaper. Removing the magazine, like closing the advertising window, reveals the newspaper page once again.

5.      TGC's entire business model depends on its ability to attract and retain advertisers. Many of these advertisers will not associate themselves with a company that operates under the constant threat of litigation and whose business practices are questioned. If TGC loses its advertising customers, TGC will be unable to survive in the current financial climate.

6.      The focus of TGC's efforts to obtain advertising clients is on those businesses who are actively involved in providing goods or services over the Internet, without regard to actual physical location of the business. The physical location of TGC's various advertising clients is unimportant to TGC and its contacts or relationships with customers in a particular state are thus largely fortuitous. Very few of TGC's contracts with businesses requesting its advertising services have been with businesses who happened to be located or headquartered in Utah. Revenue originating with Utah-based businesses between 2000 and 2003 (to date) totals $727,261, which represents seven-tenths of one percent (0.7%) of TGC's total revenues for that same period. The precise details for each year, by revenue, total number of Utah advertising clients, and percentage of the relevant year's total TGC revenue is as follows:

| Year | Utah Revenue | Number of Utah Clients | Utah percentage of Total Annual Revenue |
|------|--------------|------------------------|------------------------------------------|

| | | | |
|---|---|---|---|
| 2000 | $0.00 | 0 | 0 |
| 2001 | $653,385 | 3 | 4.45% |
| 2002 | $ 66,376 | 5 | 0.16% |
| 2003 | $ 7,500 | 1 | 0.02% |
| | | | |
| TOTALS | $727,261 | | 0.7% |

Of these totals, revenue from Overstock.com, Inc. (who was an advertising client during 2001 and part of 2002) totaled $589,858.00, most of which ($575,245.00) was generated in 2001. Overstock is no longer an advertising client of TGC.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

EXECUTED this ____ day of August, 2003 at Menlo Park, California.

_(faxed signature py. attached)_

Scott VanDeVelde

| 2000 | $ 0.00 | 0 | 0 |
| 2001 | $ 653,385 | 3 | 4.45% |
| 2002 | $ 66,376 | 5 | 0.16% |
| 2003 | $ 7,500 | 1 | 0.02% |

| TOTALS | $ 727,261 | | 0.7% |

Of these totals, revenue from Overstock.com, Inc. (who was an advertising client during 2001 and part of 2002) totaled $ 589,858.00, most of which ($ 575,245.00) was generated in 2001. Overstock is no longer an advertising client of TGC.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

EXECUTED this _18_ day of August, 2003 at Menlo Park, California.

Scott VanDeVelde

-4-

EXHIBIT "B"

DAVID W. SLAUGHTER (A2977)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
Facsimile No.: (801) 363-0400

SHEPPARD, MULLIN, RICHTER & HAMPTON
KENT RAYGOR, Cal. Bar No. 117224
PAUL S. MALINGAGIO
DAVID GARCIA, Cal. Bar No. 151349
333 South Hope Street
Forty-Eighth Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398

THE GATOR CORPORATION
L. SCOTT PRIMAK (Cal. Bar No. 152353)
2000 Bridge Parkway, Suite 100
Redwood City, California 94065
Telephone: (650) 232-0300
Facsimile: (413) 828-3071

Attorneys for Defendant The Gator Corporation

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| OVERSTOCK.COM, INC., a Delaware corporation, | |
| Plaintiff, | **DECLARATION OF MITCHELL T. WEISMAN IN SUPPORT OF DEFENDANT GATOR'S MOTION TO DISMISS** |
| vs. | |
| THE GATOR CORPORATION, a Delaware corporation, and WHENU.COM, INC., a Delaware corporation, | |
| | No. 2:03 CV 00569 TS |
| Defendants. | Judge Ted Stewart |

I, Mitchell T. Weisman, declare as follows:

1.    I am the Senior Vice President of Business Development and Finance for Defendant The TGC Corporation ("TGC"). I have held this position since September 1999. I make this declaration from my own personal knowledge and from TGC's business records maintained or reviewed in the normal course of business.

2.    In June of 1999, TGC began marketing and distributing its software applications. Since March of 2000, I have been primarily responsible for building and managing TGCs software distribution channels and increasing TGC's user base. At this time, TGC has approximately 35 million subscribers located throughout the world.

3.    TGC distributes its software applications through its various web sites accessible through www.gatorcorporation.com (the "Web Site"), and through various advertising and distribution agreements with third parties.

4.    TGC has never specifically targeted consumers in Utah for TGC software distribution through the Web Site or through any other means. TGC has no specific distribution channel dedicated or directed to Utah. Utah users obtain TGC's software in the same manner as any of TGC's users worldwide.

5.    TGC subscribers typically obtain TGC software either through TGC Internet advertising, which is not in any way directed specifically toward Utah, or through third party distributors, all of whom, to the best of my knowledge, are located outside of Utah.

6.    TGC delivers advertisements only to computer users who have agreed to TGC's privacy statement and license agreement. These computer users are informed that they will receive advertisements from TGC as a condition of obtaining one of many software programs free of charge. These computer users are notified that advertisements will be delivered to them

based on their online surfing behavior, including what Web pages they view. This business model is often referred to as "ad supported software."

7. TGC has no place of business in Utah, and to the best my knowledge, owns no property or operations in that state.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

EXECUTED this 15th day of August, 2003 at Redwood City, California.

Mitchell T. Weisman

# EXHIBIT "C"

DAVID W. SLAUGHTER (USB# 2977)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
Facsimile No.: (801) 363-0400

SHEPPARD, MULLIN, RICHTER & HAMPTON
KENT RAYGOR, Cal. Bar No. 117224
PAUL S. MALINGAGIO
DAVID GARCIA, Cal. Bar No. 151349
333 South Hope Street
Forty-Eighth Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398

THE GATOR CORPORATION
L. SCOTT PRIMAK (Cal. Bar No. 152353)
2000 Bridge Parkway, Suite 100
Redwood City, California  94065
Telephone: (650) 232-0300
Facsimile: (413) 828-3071

Attorneys for Defendant The Gator Corporation

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| OVERSTOCK.COM, INC., a Delaware corporation, | **DECLARATION OF JEFF McFADDEN** |
| Plaintiff, | |
| vs. | No. 2:03 CV 00569 TS |
| THE GATOR CORPORATION, a Delaware corporation, and WHENU.COM, INC., a Delaware corporation, | Judge Ted Stewart |
| Defendants. | |

I, Jeff McFadden, declare as follows:

1.     I am the President and Chief Executive Officer for Defendant The Gator Corporation ("TGC"). I have held this position since January 1999. I make this declaration from my own personal knowledge and from TGC's business records maintained or reviewed in the normal course of business.

2.     I have reviewed the Complaint filed by Overstock.com, Inc. ("Overstock") against TGC in the District of Utah, Case No. 2:03CV00569TS.  The activities identified in the Complaint and claimed to infringe Overstock's rights occurred mostly in the Northern District of California.  The majority of individuals who designed and implemented the GAIN software are located in the Northern District of California.  The GAIN computer servers, databases, and hardware that perform the complained of activities are located in the Northern District of California.

3.     TGC has no property or operations in Utah.

4.     I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

EXECUTED this 15th day of August, 2003 at Redwood City, California

Jeff McFadden

-2-

EXHIBIT "D"

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

**July 31, 2003**

**Date of Report (date of earliest event reported)**

# Overstock.com, Inc.

(Exact name of Registrant as specified in its charter)

| **Delaware** | **000-49799** | **87-0634302** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**6322 South 3000 East, Suite 100**
**Salt Lake City, Utah 84121**
(Address of principal executive offices)

**(801) 947-3100**
(Registrant's telephone number, including area code)
(Former name or former address, if changed since last report)

**Item 12. Results of Operations and Financial Condition**

The attached Press Release discussing Overstock.com, Inc.'s 2003 2nd quarter results is furnished herewith as Exhibit 99.1. Pursuant to the rules and regulations of the Securities and Exchange Commission, such exhibit and the information set forth therein and herein shall be deemed "furnished" and not "filed" for purpose of Section 18 of the Securities Exchange Act of 1934, as amended, and such exhibit and information shall not be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such filing.

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release issued July 30, 2003. |

2

2003, EDGAR Online, Inc.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

OVERSTOCK.COM, INC.
By:     /s/Jason C. Lindsey
          Jason C. Lindsey
          President and Chief Financial Officer
Date: July 30, 2003

3

Powered By EDGAR Online   2003, EDGAR Online, Inc.

# EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press Release issued July 30, 2003. |

4

Powered By EDGAR Online   2003.  EDGAR Online, Inc.

Exhibit 99.1

**For Immediate Release**

**Investor Contact:**
Kathryn Huang
Investor Relations
+1 (801) 947-3282
khuang@overstock.com

**Media Contact:**
Scott Blevins
Public Relations
+1 (801) 947-3133
sblevins@overstock.com

## OVERSTOCK.COM ANNOUNCES GAAP REVENUE OF $29 MILLION FOR THE SECOND QUARTER 2003

*Year-over-year GAAP sales increased 101%*
*Year-over-year GAAP losses decreased 52%*
*New streamlined return process to affect future revenue reporting*

**SALT LAKE CITY, UT – July 30, 2003** – Overstock.com, Inc. (Nasdaq: OSTK) today announced its financial results for the second quarter ended June 30, 2003.

The Company reported GAAP total revenue of $28.8 million for the quarter, a 101% increase over the $14.4 million recorded in the same period a year ago. Net loss for the second quarter was $1.1 million or $0.07 loss per share compared to $2.4 million or $0.20 loss per share a year earlier.

"The year-over-year growth remained strong, and we significantly narrowed our loss this quarter compared to first quarter," said Patrick Byrne, CEO of Overstock.com . "Several factors contributed to our improved bottom line: In April we reduced our corporate payroll by 15% to better align expenses with revenues; we restructured or eliminated underperforming marketing programs, which has helped lower our marketing spend; and we improved our gross margins. In short, if this was a four round fight I'd say we were unexpectedly dropped to the canvas at the end of the first round, but we got our knees back under us in the second, and we are getting up on our toes again now."

**New streamlined return process results in change in revenue recognition**

Overstock.com has changed its customer service and return policies and procedures to improve the shopping experience for customers. As a result, the way Overstock.com records revenue on some of its sales will change in the third quarter and thereafter.

2

As of July 1, 2003, the majority of cust      :turns will be handled through the Company      Lake City warehouse, regardless of whether they were originally shipped by Overstock.com or shipped by an Overstock.com fulfillment partner. In addition, returned products that Overstock.com resells will be shipped to consumers from the Company's warehouse in Utah. As a result of this change, starting with its third quarter 2003 results, Overstock.com will record revenues generated from the Company's fulfillment partners on a gross basis instead of on a net basis as was previously the case. (Prior to the customer service and return policies and procedures change, Overstock.com GAAP gross sales included only the commission portion earned on products shipped by fulfillment partners.)

"We have always been committed to delivering a seamless customer experience, and I believe this change is good for Overstock.com's customers because it enables us to exercise comprehensive oversight of the entire consumer experience," said Byrne. "This change in operating procedures is causing us to switch our accounting from net treatment to gross treatment on products that are drop-shipped on our behalf. Therefore, third-quarter GAAP revenues will increase dramatically. I emphasize, however, that this does not change the underlying economics of our business one iota, though it may *help* investors better understand those economics."

### Key Financial and Operating Metrics

GAAP total revenue — Overstock.com reported GAAP revenue of $28.8 million, a 101% increase over the $14.4 million recorded in the same period a year ago.

GAAP gross profit — Overstock.com reported GAAP gross profit was $4.8 million, an 88% increase over the $2.5 million recorded in the same period a year ago.

GAAP gross margins — GAAP gross margins were 17% compared to 18% for second quarter 2002.

GAAP net loss — Overstock.com reported a GAAP net loss of $1.1 million or $0.07 loss per share compared to $2.4 million or $0.20 loss per share a year earlier.

Gross merchandise sales — Gross merchandise sales (non-GAAP) were $51.3 million, a 94% increase over the $26.5 million recorded in the same period a year ago. Gross merchandise sales

3

represents the gross sales price of all sales transactions, including those for which the company records a commission under generally accepted accounting principles, and therefore differs from GAAP revenue. The following table reconciles total revenue to gross merchandise sales:

|  | Three months ended (millions) | | | |
|  | June 30, 2002 | | June 30, 2003 | |
|---|---|---|---|---|
| Total revenue | $ | 14.4 | $ | 28.8 |
| Add: Obligations payable to third parties upon sale of third-party merchandise | $ | 9.5 | $ | 19.4 |
| Add: Sales returns and discounts | $ | 2.6 | $ | 3.1 |
| Gross merchandise sales (non-GAAP) | $ | 26.5 | $ | 51.3 |

Overstock.com had cash and marketable securities of $31.7 million at quarter end compared to $32.7 million on December 31, 2002.

**About Overstock.com**

Overstock.com Inc. is an online "closeout" retailer offering discount, brand-name merchandise for sale over the Internet. The company offers its customers an opportunity to shop for bargains conveniently, while offering its suppliers an alternative inventory liquidation distribution channel. Overstock.com is a publicly traded company listed on the NASDAQ National Market System, headquartered in Salt Lake City, and can be found online at www.overstock.com. Overstock.com is a registered trademark of Overstock.com, Inc.

# # #

This press release contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements include, but are not limited to, statements regarding the company's growth, future performance, and customer service enhancements. These forward-looking statements involve certain risks and uncertainties that could cause actual results to differ, including, but not limited to, our limited operating history, our ability to manage growth, a general downturn in economic conditions, and such other risks as identified in our Prospectus dated May 29, 2002, filed with the Securities and Exchange Commission and all subsequent filings with the Securities and Exchange Commission, including our Form 10- K for the year ended December 31, 2002, and our Prospectus dated February 12, 2003, which contain and identify

4

2003, EDGAR Online, Inc.

important factors that could cause the actual results to differ materially from those contained in our projections or forward-looking statements.

5

Powered by EDGAR Online   2003, EDGAR Online, Inc.

**Overstock.com, Inc.**

Consolidated Statements of Operations

(in thousands, except per share amounts)

| | | Three months ended | | | |
|---|---|---|---|---|---|
| | Jun. 30, 2002 | Sept. 30, 2002 | Dec. 31, 2002 | Mar. 31, 2003 | Jun. 30, 2003 |
| Direct revenue | $ 11,853 | $ 20,759 | $ 35,302 | $ 24,962 | $ 25,159 |
| Commission revenue | 2,230 | 2,857 | 5,633 | 3,966 | 3,431 |
| Warehouse revenue | 297 | 192 | 594 | 236 | 243 |
| Total revenue | 14,380 | 23,808 | 41,529 | 29,164 | 28,833 |
| Cost of goods sold | 11,831 | 19,238 | 32,382 | 24,539 | 24,030 |
| Gross profit | 2,549 | 4,570 | 9,147 | 4,625 | 4,803 |
| Operating expenses: | | | | | |
| Sales and marketing expenses | 1,313 | 2,083 | 4,054 | 3,848 | 2,572 |
| General and administrative expenses | 2,195 | 2,372 | 3,456 | 4,545 | 3,367 |
| Amortization of stock-based compensation | 806 | 674 | 577 | 328 | 112 |
| Total operating expenses | 4,314 | 5,129 | 8,087 | 8,721 | 6,051 |
| Operating income (loss) | (1,765 ) | (559 ) | 1,060 | (4,096 ) | (1,248 ) |
| Interest income | 49 | 229 | 103 | 152 | 142 |
| Interest expense | (208 ) | (7 ) | (10 ) | (7 ) | (55 ) |
| Other income (expense), net | (442 ) | 63 | (66 ) | 10 | 25 |
| Net income (loss) | (2,366 ) | (274 ) | 1,087 | (3,941 ) | (1,136 ) |
| Deemed dividend related to redeemable common stock | (106 ) | (97 ) | (92 ) | (77 ) | (78 ) |
| Net income (loss) attributable to common shares | $ (2,472 ) $ | (371 ) $ | 995 $ | (4,018 )$ | (1,214 ) |
| Net income (loss) per share | | | | | |
| • basic | $ (0.20 ) $ | (0.03 ) $ | 0.07 $ | (0.26 )$ | (0.07 ) |
| • diluted | $ (0.20 ) $ | (0.03 ) $ | 0.06 $ | (0.26 )$ | (0.07 ) |
| Weighted average common shares outstanding | | | | | |
| • basic | 12,280 | 14,447 | 14,486 | 15,486 | 16,384 |
| • diluted | 12,280 | 14,447 | 15,696 | 15,486 | 16,384 |
| **Reconciliation of total revenue (GAAP) to gross merchandise sales (non-GAAP)** | | | | | |
| Total revenue | $ 14,380 | $ 23,808 | $ 41,529 | $ 29,164 | $ 28,833 |
| Add: Obligations payable to third parties upon sale of third-party merchandise | 9,474 | 12,488 | 21,969 | 20,527 | 19,399 |
| Add: Sales returns and discounts | 2,651 | 2,476 | 3,719 | 2,579 | 3,083 |
| Gross merchandise sales (non-GAAP) | $ 26,505 | $ 38,772 | $ 67,217 | $ 52,270 | $ 51,315 |

6

2003. EDGAR Online, Inc.

## Overstock.com, Inc.

### Consolidated Statements of Operations

(in thousands, except per share amounts)

| | | Six months ended June 30, | | |
|---|---|---|---|---|
| | | 2002 | | 2003 |
| Direct revenue | $ | 21,882 | $ | 50,121 |
| Commission revenue | | 3,889 | | 7,397 |
| Warehouse revenue | | 676 | | 479 |
| Total revenue | | 26,447 | | 57,997 |
| Cost of goods sold | | 21,821 | | 48,569 |
| Gross profit | | 4,626 | | 9,428 |
| Operating expenses: | | | | |
| Sales and marketing expenses | | 2,532 | | 6,420 |
| General and administrative expenses | | 4,997 | | 7,912 |
| Amortization of stock-based compensation | | 1,652 | | 440 |
| Total operating expenses | | 9,181 | | 14,772 |
| Operating loss | | (4,555 ) | | (5,344 ) |
| Interest income | | 71 | | 294 |
| Interest expense | | (448 ) | | (62 ) |
| Other income (expense), net | | (441 ) | | 35 |
| Net loss | | (5,373 ) | | (5,077 ) |
| Deemed dividend related to redeemable common stock | | (217 ) | | (155 ) |
| Deemed dividend related to beneficial conversion feature of preferred stock | | (6,607 ) | | — |
| Net loss attributable to common shares | $ | (12,197 ) | $ | (5,232 ) |
| Net loss per common share | $ | (1.04 ) | $ | (0.33 ) |
| Weighted average common shares outstanding | | 11,728 | | 15,938 |

### Overstock.com, Inc.

### Consolidated Balance Sheet Data

(in thousands)

| | | December 31, 2002 | June 30, 2003 |
|---|---|---|---|
| Cash and marketable securities | $ | 32,662 $ | 31,664 |
| Inventories, net | | 13,954 | 19,475 |
| Working capital | | 35,679 | 55,154 |
| Total liabilities | | 20,322 | 11,804 |
| Total stockholders' equity | | 39,271 | 60,437 |

7

**End of Filing**

Powered By *EDGAR* ONLINE   2003.   EDGAR Online, Inc.